KATZ DRUG COMPANY, Respondent,

v.

KANSAS CITY POWER & LIGHT COMPANY, Appellant.

No. 22447.

Kansas City Court of Appeals.

Missouri.

May 13, 1957.

Spencer, Fane, Britt & Browne, Irvin Fane, Arthur J. Doyle, Kansas City, for appellant.

Dick H. Woods, Kansas City, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, of counsel, for respondent.

BOUR, Commissioner.

Katz Drug Company brought suit against Kansas City Power & Light Company to recover part of the total amount paid by plaintiff to defendant for electric current furnished to plaintiff at a building located at 1001 Main Street, Kansas City, Missouri, during the period from September 1, 1946 to January 31, 1950. The petition was based upon a written contract between the parties made pursuant to Rule 35 of defendant's General Rules and Regulations. Rule 35 had been filed with and approved by the Public Service Commission of Missouri, and it was made a part of the contract by reference. Plaintiff claimed that it fully performed "its obligations under the contract"; therefore it was entitled to a refund equal to the difference between (1) the total amount paid by it, at the direct current

rate, for electric current furnished by defendant at 1001 Main Street during the period mentioned above, and (2) the total amount it would have paid for such service during the same period had the lower rate for alternating current been applied, the difference between the two amounts being $1,582.30. Defendant, in its answer, admitted the execution of the contract, denied that plaintiff had performed its "obligations under the contract", and pleaded that the circuit court had "no jurisdiction over the subject matter placed in controversy by plaintiff's petition", which plea was overruled. The trial was before the court, a jury having been waived, and resulted in a judgment in favor of plaintiff for $1,582.30 with interest in the amount of $450.95, a total of $2,033.25. Defendant has appealed.

The case was submitted to the court upon a stipulation of facts, the testimony of two witnesses, and certain exhibits. The stipulated facts are as follows:

"1. Plaintiff (Katz Drug Company) is now and at all times hereinafter mentioned was a corporation organized under the laws of the State of Delaware and duly qualified and authorized to do business in the State of Missouri. Plaintiff is now and at all times hereinafter mentioned was engaged in the retail drug business.

"2. Defendant (Kansas City Power & Light Company) is now and at all times hereafter mentioned was a public utility corporation organized and existing under the laws of the State of Missouri and engaged in supplying both alternating current and direct current electrical power and energy to consumers in Kansas City, Jackson County, Missouri, and environs.

"3. On or about August 1, 1946, defendant, filed pursuant to law and the regulations of the Public Service Commission of the State of Missouri, Rule 35 of its General Rules and Regulations, as part of its published rates and tariffs. Said commission approved said Rule 35 effective September 1, 1946, in the following form:

"'35

"'Conversion To Alternating Current Service.

"'Due to inability of the Company to provide alternating current service immediately for present users of direct current service the following provision will compensate the consumer for using direct current service until alternating current is made available:

"'Conversion Privilege.

"'Any consumer receiving direct current service may contract to change over his entire load to alternating current service within a period of five (5) years from September 1, 1946. If the consumer completes the transfer, then he shall receive a refund equivalent to the difference in the amount paid by him at the rate for direct current service and the amount he would have paid at the rate for alternating current service. The refund shall be from the date the consumer certifies that he will change over his load to the date the transfer is completed and the direct current service removed from the premises, which date shall be not later than five (5) years from September 1, 1946.

"'In the event the consumer fails to convert his load from direct to alternating current in its entirety within the prescribed period of time, he shall forfeit all rights to a refund of the difference between the amount paid for direct current and what he would have paid for alternating current service.

"'The term "consumer" as used herein covers the service now being delivered through a specific meter or meters and billed as one account. A consumer will not be permitted to divide his load in order to qualify for the benefits of this provision.'

"4. At and prior to September 1, 1946, the date of the filing of said Rule 35, plaintiff leased and occupied the premises located at 1001 Main Street, Kansas City, Missouri

(SE Corner of 10th and Main Streets), and operated a retail drug store at such premises, which said store was carried by plaintiff on its books as its store 'No. 5.' The connected lighting and power load at such premises was equipped for direct current operation and not for alternating current operation. Defendant furnished direct current electric service to the plaintiff as the occupant of such premises through its DC Meter No. 223–S–144081 as Account No 4–078–29420.

"5. After the filing of said Rule 35 with the Public Service Commission of Missouri, defendant, in pursuance thereof, and on or about the 14th day of October, 1946, entered into a written contract with plaintiff as follows:

" 'This Memorandum of Agreement, made this 14th day of October, 1946, by and between the Kansas City Power & Light Company of Kansas City, Missouri, a corporation organized under the laws of the State of Missouri, having its place of business in the City of Kansas City of said State, hereinafter called the "Company" and Katz Drug Company, occupant of the premises at 1001 Main, used as a Store, in Kansas City, Jackson County, Missouri, hereinafter called the "Direct Current Consumer."

" 'Whereas, the Company filed, as of August 1, 1946, a rate for secondary alternating current service which became effective September 1, 1946; and

" 'Whereas, the Direct Current Consumer is at present taking direct current service from the Company at the above address; and

" 'Whereas, the rate for direct current service is higher than the rate for alternating current service; and

" 'Whereas, the Company desires to give the Direct Current Consumer the advantages of the rate for alternating current service from the effective date thereof;

" 'Now, Therefore, in consideration of the premises and of the mutual covenants and agreements hereinafter set out, the parties hereto do hereby covenant and agree each with the other as follows:

" '1. The Direct Current Consumer agrees to convert, prior to September 1, 1951, all of the present load whether light or power, and any addition thereto, now served by direct current so that it may be operated with alternating current. Said conversion and the providing of a new entrance switch for alternating current to be made by the Direct Current Consumer at the expense of the Direct Current Consumer.

" '2. If a Direct Current Consumer complies with the provisions of paragraph 1 hereof, the Company will refund to the Direct Current Consumer upon completion of the conversion from direct current to alternating current service, the difference in the amount paid by the Direct Current Consumer at the rate for direct current service and the amount the Direct Current Consumer would have paid at the rate for alternating current service. The refund will be made on all bills for service rendered to Direct Current Consumer from September 1, 1946 to the date of qualification for the alternating current rate by a complete conversion from direct current to alternating current service.

" '3. The Direct Current Consumer, as referred to herein, covers the direct current service now delivered, or any addition thereto, through specific meter or meters billed by the Company as one account. If a Direct Current Consumer converts said load to alternating current from time to time prior to September 1, 1951, then the Company will continue to bill, for the alternating current service at the rate for direct current service, by combining the simultaneous demands of the two classes of service and the kilowatt hours so delivered as one account until such time as the conversion of direct current service is completed, so that the Direct Current Consumer

will have qualified for the rate for alternating current service.

" '4. The Direct Current Consumer to qualify for the refund mentioned in paragraph 2 hereof must eliminate entirely, before September 1, 1951, the use of any direct current energy by equipment supplied through one account and will not be permitted to divide said load covered by one account in order to qualify for the refund.

" '5. If a Direct Consumer contracts to and fails to convert, prior to September 1, 1951, from direct current to alternating current service, billed as one account, then the Direct Current Consumer forfeits all rights to a refund of the difference between the amount paid at the rate for direct current service and what would have been paid at the rate for alternating current service.

" '6. This agreement is made pursuant to Rule No. 35 of the Rules and Regulations filed with the Public Service Commission of Missouri, which Rule became effective September 1, 1946, and said Rule is made a part of this agreement.

" '7. This agreement is. made in all respects subject to the terms and provisions of the Public Service Commission laws of the State of Missouri and all acts mandatory thereto and to the jurisdiction and authority of the Public Service Commission. Nothing herein contained shall be construed as divesting, or attempting to divest, said Commission of any of its rights, jurisdictions, powers or authority invested in said Commission by law.

" 'In Witness Whereof, the parties hereto have caused this agreement to be duly executed in Duplicate, the day and year first above written.

" 'Kansas City Power & Light Company,
　　By E. C. Burke.

Katz Drug Company,
　　　　Consumer.
　　By Tim Blond.

" 'Approved J. M. Arthur—10-21-46'

"6. Subsequent to the execution by the parties of the written agreement set out in paragraph 5 above and prior to January 31, 1950, the date upon which plaintiff terminated its account with defendant for electric service at 1001 Main Street, plaintiff in reliance upon the provisions of said Rule 35 and the terms of the said agreement, did convert its direct current air-conditioning equipment, ventilating motors and neon signs located at 1001 Main Street to alternating current operation, but did not entirely eliminate or convert all of the wiring and equipment at such premises from direct current to alternating current operation. During such period defendant continued to supply plaintiff at such premises (a) with direct current service through DC Meter No. 223–S–144081 and (b) in addition, after July 8, 1947, with alternating current service through AC Meter No. 31–VY–143032 for such equipment as plaintiff had converted to alternating current operation.

"7. Plaintiff was charged at the direct current rate for all electrical service, alternating as well as direct, furnished by defendant to plaintiff at its retail drug store at 1001 Main Street the total amount of $16,646.62 during the period from September 1, 1946, to January 31, 1950, while the alternating current rate for the same amount of electric service at such premises during the same period of time would have been $15,064.32."

As stated above, two witnesses testified at the trial. One witness, Oliver Erickson, was called by plaintiff; the other witness, Edmund C. Burke, was called by defendant. Mr. Erickson testified that he was secretary and assistant treasurer of the plaintiff corporation; that he had worked for plaintiff about twenty-three years; and that the contract here involved was prepared by defendant. Mr. Burke testified that he was employed by defendant in its "power and lighting sales department" and had been so employed for more than

twenty years. The testimony further discloses the following facts:

For many years, plaintiff has been operating retail drug stores at various locations in and about Kansas City, Missouri, and defendant has been furnishing electric service to plaintiff at all of plaintiff's drug stores within the territory served by defendant. At the time of the trial, defendant was supplying electric current to plaintiff at fifteen such stores. Defendant installed a separate meter or meters at each of the stores served by it. The service rendered to plaintiff at "each of the separate premises" was carried on defendant's books as a separate account, and each account was designated by a particular number. Defendant's "account numbers" consisted of connected combinations of figures, e. g., No. 4-078-29420. The first figure indicated the district in which the meter serving the particular "premises" was located; the figures between the dashes indicated "the meter-reading route" on which the meter was located; and the last set of figures was "the number assigned to the account of that particular customer at that address". The "account numbers" did not "follow the customer from place to place"; they "stayed at a definite location". Mr. Burke testified: "Q. How about the meters, do they stay there or do they move, transfer with the customer? A. They would stay there unless there was an increase or decrease of capacity of the subsequent tenant requiring a change or some defect in the meter. Normally they would stay with the account number." Plaintiff received from the defendant each month a separate bill for the electric service furnished to plaintiff at each drug store within defendant's service territory. The account number and the address of the premises at which such service was furnished appeared on each bill.

As we have seen, it appears from the stipulation of facts that "prior to September 1, 1946, * * * plaintiff leased and occupied the premises located at 1001 Main Street, Kansas City, Missouri * * *, and operated a retail drug store at such premises"; that "said store was carried by plaintiff on its books as its store 'No. 5'"; that the contract in question was executed by the parties on October 14, 1946; that thereafter, in July, 1946, plaintiff converted "its direct current air-conditioning equipment, ventilating motors and neon signs located at 1001 Main Street to alternating current operation, but did not entirely eliminate or convert all of the wiring and equipment at such premises from direct current to alternating current operation". See paragraphs 4, 5 and 6 of the stipulation, supra. Plaintiff's witness testified that in July, 1947, plaintiff spent about $1,140 in converting the air-conditioning equipment, ventilating fans and neon signs from direct current (d.c.) to alternating current (a.c.) operation.

The testimony shows that in the fall of 1949 plaintiff requested defendant to furnish it with alternating current at a store building located at 921–923 Main Street in Kansas City, Missouri, which building had been leased to plaintiff for use as a retail drug store. The electric equipment in that building could be operated only by alternating current. On November 11, 1949, defendant installed its a. c. meter No. 5101-108 at 921–923 Main Street. Since that date defendant has been furnishing alternating current to plaintiff through that meter and at that address as account No. 4-078-29410, and plaintiff has received from defendant each month a separate bill for such service. Between November 11, 1949 and January 1, 1950, plaintiff remodeled the above-mentioned building and in so doing installed "a great amount" of new electric equipment. This new equipment cost about $25,700 and all of it was so constructed that it could be operated only by alternating current. On the night of December 31, 1949, plaintiff closed its store at 1001 Main Street (the southeast corner of 10th and Main) and moved the merchandise in that store to the store at 921–923 Main Street (the northeast corner of 10th and Main). On the morning of January 1, 1950, plaintiff opened its new store at 921–923 Main Street, and

thereafter the new store was designated on plaintiff's books as "store No. 5". This store "was about three times the size of the store at 1001 Main Street". The employees at 1001 Main Street were transferred to the new store.

It appears from the testimony that plaintiff's lease of the premises at 1001 Main Street "terminated on January 31, 1950"; that from April 8, 1947 to January 31, 1950, defendant furnished to plaintiff, at 1001 Main Street (account No. 4-078-29420), two classes of electric service—namely, direct current service (through d.c. meter No. 223-S-144081) for the equipment which plaintiff had not converted to alternating current operation, and alternating current service for the equipment which plaintiff had converted from direct current to alternating current operation (see also paragraph 6 of the stipulation, supra); and that pursuant to said Rule 35 and paragraph 3 of the contract defendant billed plaintiff for both classes of electric service at the rate for direct current service by combining, as one account (i. e., account No. 4-078-29420), the simultaneous demands of the two classes of service and the kilowatt hours so delivered at 1001 Main Street, during the period from April 8, 1947 to January 31, 1950. It appears from the stipulation that on the last-mentioned date plaintiff "terminated its account with defendant for electric service at 1001 Main Street".

It further appears from the testimony that when plaintiff vacated the premises at 1001 Main Street on January 31, 1950, "some" of the direct current equipment was still "connected" and that such equipment remained there until April 23, 1954; that from January 31, 1950 to April 23, 1954, defendant furnished direct current service at 1001 Main Street for the electric equipment which had not been converted to alternating current operation; that such direct current service was furnished to successive "occupants" or "lessees" of the premises through defendant's d.c. meter No. 223-S-144081 "as account No. 4-078-29420";

and that all of said direct current equipment was converted to alternating current operation on April 23, 1954, at which time defendant removed its d.c. meter No. 223-S-144081.

After the plaintiff opened its store at 921–923 Main Street, it made demand on defendant for the refund mentioned in paragraph 2 of the contract, which demand was refused. The record does not disclose the date of demand. This suit was filed on January 24, 1951, and the case was tried on August 25, 1955.

Defendant's first point is that the court erred in refusing to dismiss plaintiff's petition for want of jurisdiction over the subject matter of the action. In this connection defendant asserts that the Public Service Commission "has jurisdiction to hear complaints against electric utilities with respect to their rates and charges and rules applicable thereto"; that "where the 'gist and gravamen of the complaint' is a matter placed within the jurisdiction of the Commission by the Public Service Commission Law", the commission has exclusive primary jurisdiction "to hear the complaint and determine the facts but it may not enter a judgment or order for a pecuniary reparation or refund"; that since the instant case "involves the application, pursuant to Rule 35 * * *, of the defendant's rates fixed by the Commission for the classes of service used by plaintiff", initial and exclusive jurisdiction to determine "the facts concerning the alleged conversion by plaintiff of its load from direct current to alternating current operation" is vested in the Commission; that the "question of whether under Rule 35 the plaintiff had so converted its entire load to alternating current" is a question of fact; and that since "plaintiff's petition failed to allege that there had been any such final determination of facts by the Commission", the circuit court was without jurisdiction of the subject matter of the action. Defendant is right in saying that plaintiff's petition does not contain such an allegation. Plaintiff contends that the commission has *no*

jurisdiction, original or otherwise, of such a controversy; and that the circuit court had exclusive original jurisdiction of the subject matter of the action.

In support of its first point defendant cites Sections 386.390, subd. 1, and 393.140 (11) RSMo 1949, V.A.M.S.; State ex rel. Laundry, Inc. v. Public Service Commission, 327 Mo. 93, 34 S.W.2d 37; Kansas City Light & Power Co. v. Midland Realty Co., 338 Mo. 1141, 93 S.W.2d 954, affirmed 300 U.S. 109, 57 S.Ct. 345, 81 L.Ed. 540; State ex rel. and to Use of Public Service Commission v. Padberg, 346 Mo. 1133, 145 S.W.2d 150; State ex rel. Lambert v. Padberg, 346 Mo. 1082, 145 S.W.2d 123; State ex rel. and to Use of Cirese v. Ridge, 345 Mo. 1096, 138 S.W.2d 1012; State ex rel. Lambert v. Flynn, 348 Mo. 525, 154 S.W.2d 52; State ex rel. and to Use of Kansas City Power & Light Co. v. Buzard, 350 Mo. 763, 168 S.W.2d 1044; State ex rel. Consumers Public Service Co. v. Public Service Commission, 352 Mo. 905, 180 S.W.2d 40; State ex rel. Gehrs v. Public Service Commission, 232 Mo.App. 1018, 114 S.W.2d 161; and other cases. A careful reading of the statutes and cases cited reveals that none of them supports the contention made by defendant.

■ As stated in State ex rel. and to Use of Cirese v. Ridge, supra, 138 S.W.2d 1012, 1015, our supreme court has consistently adhered to the rule that matters within the jurisdiction of the Public Service Commission "must first be determined by it, in every instance, before the courts will adjudge any phase of the controversy * *". See also State ex rel. Taylor v. Nangle, Mo.Sup., 227 S.W.2d 655, 657. However, the commission is a body of limited jurisdiction and has only such powers as are conferred upon it by the statutes, and such incidental powers as may be necessary to enable the commission to exercise the powers granted. State ex rel. and to Use of Kansas City Power & Light Co. v. Buzard, supra, 168 S.W.2d 1044, 1046.

■ "The Public Service Commission is an administrative body only, and not a court, and hence the commission has no power to exercise or perform a judicial function, or to promulgate an order requiring a pecuniary reparation or refund." State ex rel. Laundry, Inc. v. Public Service Commission, supra, 34 S.W.2d 37, 46; Straube v. Bowling Green Gas Co., 360 Mo. 132, 227 S.W.2d 666, 668, 18 A.L.R.2d 1335. "The commission 'has no power to declare or enforce any principle of law or equity' * * * and as a result it cannot determine damages or award pecuniary relief." American Petroleum Exchange v. Public Service Commission, Mo.Sup., 172 S.W.2d 952, 954, 955; Board of Public Works of Rolla v. Sho-Me Power Corp., 362 Mo. 730, 244 S.W.2d 55, 59; Consumers Public Service Co. v. Public Service Comm., 352 Mo. 905, 180 S.W.2d 40; State ex rel. Missouri Pacific R. Co. v. Public Service Commission, 303 Mo. 212, 259 S.W. 445. Since the commission is not a court, it "has neither the power to construe contracts, nor to enforce them". State ex rel. Washington University v. Public Service Commission, 308 Mo. 328, 272 S.W. 971, 972. See also May Department Stores Co. v. Union Electric Light & Power Co., 341 Mo. 299, 107 S.W.2d 41, 49; Kansas City Light & Power Co. v. Midland Realty Co., supra, 93 S.W.2d 954, 959; State ex rel. Gehrs v. Public Service Commission, supra, 114 S.W.2d 161, 165. It "has no authority to adjudicate and determine individual or personal rights * * * because under the Constitution the Legislature has no power or authority to invest such Commission with judicial powers". State ex rel. Rutledge v. Public Service Commission, 316 Mo. 233, 289 S.W. 785, 787; State ex rel. Consumers Public Service Co. v. Public Service Commission, supra, 180 S.W.2d 40, 44.

■ The petition in the instant case is too long to set out in full. It is sufficient to say that plaintiff's action was based upon defendant's alleged breach of the contract dated October 14, 1946. Defendant states

in its brief that "(t)he petition for such refund * * * was based upon a written contract expressly incorporating defendant's Rule 35". The validity of the contract was not questioned. The only material issue relating to the merits of the case was whether the plaintiff had fully performed the contract on its part. The determination of this question involved the construction of the contract. There was no dispute concerning the facts. Some of the facts were stipulated, with the right reserved to the parties "to object" that any stipulated fact "is not relevant or material to any issue presented in this matter"; there was no material conflict in the testimony of the two witnesses; and the testimony was not inconsistent with any of the stipulated facts. The controverted question was how the contract, including Rule 35, should be construed. As stated, the Public Service Commission has no power to construe or to enforce contracts. On the other hand, circuit courts have exclusive original jurisdiction in all civil cases not otherwise provided for. Art. V, Sec. 14, Const.Mo. 1945, V.A.M.S. The trial court did not err in refusing to dismiss plaintiff's petition for lack of jurisdiction of the subject matter of the action.

This brings us to the merits of the case. Since the case was tried without a jury, the judgment should not be set aside unless it is clearly erroneous. Section 510.310 subd. 4 RSMo 1949, V.A.M.S.

Defendant's second point is that "the trial court erred in finding that plaintiff had performed its obligations under the contract". The question argued is the disputed question of construction of the contract. Both parties assert that the contract, which was prepared by defendant, is clear and unambiguous. Plaintiff contends that "if the contract is ambiguous", it must be construed most strongly against the party who prepared it. This rule, however, is only to be applied when all other means of construction fail. Isaac T. Cook Co. v. Bank of St. Louis, Mo.App., 297 S.W.2d

607, 610. It is commonly said that the cardinal rule to be observed in construing a written contract is to ascertain and give effect to the intention of the parties unless it conflicts with some positive rule of law; and that "greater regard is to be had to their clear intent than to any particular words they may have used in attempting to express it". Larson v. Crescent Planing Mill Co., Mo.App., 218 S.W.2d 814, 819. See also Veatch v. Black, 363 Mo. 190, 250 S.W.2d 501, 507; Hogue v. Wurdack, Mo. App., 298 S.W.2d 492, 495; Stephenson v. Morrissey, Mo.App., 230 S.W.2d 124, 127. The language of a contract will be given its ordinary and usual meaning unless it is clear that some special or peculiar meaning was intended by the parties. Burress v. Blair, 61 Mo. 133, 140; Truck Leasing Corp. v. Esquire Laundry & Dry Cleaning Co., Mo.App., 252 S.W.2d 108, 111; 3 Williston on Contracts (Rev.Ed.), sec. 618, p. 1777. The entire contract must be considered in determining the meaning of each part, and effect should be given to every part of the contract, if that be reasonably possible. Cook v. Tide Water Associated Oil Co., Mo.App., 281 S.W.2d 415, 419 and cases cited; 17 C.J.S. Contracts § 297, pp. 707, 710; Restatement of the Law of Contracts, sec. 235(c). In determining the meaning of a written contract, where the language of the instrument is not clear or is ambiguous, the court may consider the situation of the parties and the surrounding circumstances at the time the contract was executed. Ruysser v. Smith, Mo.Sup., 293 S.W.2d 930, 934; Veatch v. Black, supra; Gabel-Lockhart Co. v. Gabel, 360 Mo. 518, 229 S.W.2d 539, 543; Kossmehl v. Miller Nat. Ins. Co., 238 Mo.App. 671, 185 S.W. 2d 293, 295 (quoting Restatement, Contracts, sec. 235, comment d); Velvet Freeze, Inc., v. Milk Wagon Drivers', etc., Union, Mo. App., 177 S.W.2d 644, 646 (quoting Restatement, Contracts, sec. 235).

"While recitals, as a general rule, are not strictly any part of the contract, unless it appears that the parties intended them to be such, they may be looked to in deter-

mining the proper construction of the contract or the intention of the parties, at least when the language expressing their contractual relations is ambiguous, uncertain, or indefinite." 17 C.J.S. Contracts § 314, p. 733, cited in Blankenship v. Kiehne, 240 Mo.App. 1197, 225 S.W.2d 166, 169. "Recitals may be resorted to for the purpose of explaining the subject matter of the contract and the general intentions of the parties with reference thereto; * * *." Miller v. Wagenhauser, 18 Mo.App. 11, 14. See also Dart v. Bagley, 110 Mo. 42, 54, 19 S W. 311, 313.

As heretofore indicated, in the instant case the parties do not agree as to the proper construction of the contract dated October 14, 1946. According to defendant's construction, plaintiff was required to convert, prior to September 1, 1951, all of the direct current equipment on its premises at 1001 Main Street on October 14, 1946, and any additions thereto, to alternating current operation, in order to qualify for the refund mentioned in paragraph 2 of the contract. Among other arguments in support of this view, defendant asserts that "wherever the term 'Direct Current Consumer' appears" in the contract, "it must be read in the light of the definition, namely, 'Katz Drug Company, occupant of the premises at 1001 Main'"; and in this connection defendant emphasizes the second "whereas" clause, as well as certain words in the operative provisions of the contract.

█ The parties stipulated that the store at 1001 Main Street "was carried by plaintiff on its books as its store 'No. 5'". As stated, after the plaintiff opened the store at 921–923 Main Street, that store was designated on plaintiff's books as store 'No. 5'. Plaintiff asserts that it "had but one store No. 5 in operation at any one time, the move having taken place on the night of December 31, 1949, so that the store's operation could be continued at the new location across the street on the next day"; and that by moving "store No. 5" from 1001

Main Street to 921–923 Main Street, where no direct current service was required, it "performed all of its obligations under the contract". We are of the opinion that the contract is not susceptible of any such construction.

The opening paragraph of the contract recited in part: "This * * * Agreement, made this 14th day of October, 1946, by and between the Kansas City Power & Light Company, * * *, hereinafter called the 'Company', and Katz Drug Company, *occupant of the premises at 1001 Main* [1], used as a Store, in Kansas City, * * * Missouri, hereinafter called the 'Direct Current Consumer.'" The second "whereas" clause stated as a fact that, "the Direct Current Consumer *is at present taking direct current service* from the Company at *the above address*". The first sentence in paragraph number 3 of the contract stated that the "Direct Current Consumer, as referred to herein, covers *the direct current service now delivered, or* any addition thereto, *through* (a) *specific meter or meters* (and) *billed by the Company as one account*". It would seem that the words "a" and "and", which we have inserted in paragraph 3, were omitted by mistake, and that the first "or" was used in the sense of "and". We think it is clear that the words "direct current service *now delivered*" referred to the direct current service furnished to plaintiff "at the above address" (i. e., 1001 Main Street) on October 14, 1946, the date of the contract. Furthermore, the admitted and undisputed facts show that on and prior to October 14, 1946, all of the electric equipment used by plaintiff at 1001 Main Street required direct current service; that such service was furnished to plaintiff through a "specific meter" installed by defendant at 1001 Main Street; and that all of the electric service furnished to plaintiff at 1001 Main Street, both before and after the execution of the contract, was "billed by the Company as one account". In this connection see the second sentence in paragraph 3 of the contract. It should be added that the

1. All italics within quotations have been supplied.

first sentence in paragraph 3 is substantially the same as the first sentence in the last paragraph of defendant's Rule 35, which was made a part of the contract.

The first sentence in paragraph number 1 of the contract reads: "The Direct Current Consumer agrees *to convert,* prior to September 1, 1951, *all of the present load* whether light or power, and any addition thereto, *now served by direct current* so that *it* may be *operated* with alternating current." It is obvious that the words "and any addition thereto" should be considered as having been placed *after* the words "now served by direct current". See Williston on Contracts (Rev.Ed.), sec. 619, p. 1782. The first sentence in paragraph 2 provided that if the "Direct Consumer *complies with the provisions of paragraph 1* hereof, the Company will refund to the Direct Current Consumer upon completion of *the conversion* from direct current to alternating current service, the difference", etc. It is conceded that if a consumer's electric equipment can be operated only by direct current, and the service of electric energy is changed from the direct current type to the alternating current type, the consumer's direct current equipment must be changed or "converted" so that the alternating current may be received and utilized; and in our opinion, the context of the written contract shows that the term "load", in paragraph 1, comprehends the consumer's electric equipment. See Encyclopedia Britannica (17th Ed.), Vol. 8, p. 150; 3 Williston on Contracts (Rev.Ed.), sec. 618, p. 1777; Restatement, Contracts, sec. 235(b). In this connection we have noted the use of the word "operated" in paragraph 1. With the phrase "occupant of the premises at 1001 Main" and the second "whereas" clause in mind, we think it is apparent that the word "load", in paragraph 1, referred to the electric equipment used by plaintiff and "served by direct current" at 1001 Main Street on October 14, 1946, "and any addition thereto". Considering paragraph 1 in its entirety, we note that the second sentence in that

paragraph required *"(s)aid conversion* and the providing of a new entrance switch for alternating current to be made by" and "at the expense of the Direct Current Consumer".

Paragraph 4 provided in part that the "Direct Current Consumer to qualify for the refund mentioned in *paragraph 2* hereof, *must eliminate entirely,* before September 1, 1951, *the use* of any direct current energy *by equipment supplied through one account * * **". We have no doubt that the word "equipment" must be interpreted as meaning the direct current equipment at 1001 Main Street on October 14, 1946, and any addition thereto. Paragraph 5 provided that if a "Direct Current Consumer contracts to and fails *to convert,* prior to September 1, 1951, from direct current to alternating current service, then the Direct Current Consumer forfeits all rights to a refund of the difference", etc. By paragraph 6 of the contract, defendant's Rule 35, which had been approved by our Public Service Commission, effective September 1, 1951, was made a part of the contract. Since Rule 35 is set out in full in the stipulation of facts, we do not deem it necessary to copy here any of the provisions of that rule.

Now, what was the plaintiff (the "Direct Current Consumer") required to do in order to qualify for the refund mentioned in paragraph 2 of the contract? With all of the foregoing in mind, including Rule 35, we are convinced that, when the contract is considered as a whole and in the light of the surrounding circumstances at the time the contract was made, it must be construed to mean that plaintiff was required to convert, before September 1, 1951, all of the direct current equipment on its premises at 1001 Main Street on October 14, 1946, and any addition thereto, to alternating current operation, so that all of the electric equipment on said premises could be operated with alternating current. This the plaintiff failed to do. Consequently the plaintiff was not entitled to recover.

' The judgment should be reversed and the cause remanded with directions to enter judgment for defendant. The commissioner so recommends.

SPERRY, C., concurs.

PER CURIAM.

. The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment is reversed and the cause remanded with directions to enter judgment for defendant.

CAVE, J., and MAUGHMER, Special Judge, concur.

DEW, J. (retired), not participating.